MICHAEL MARTIN, Appellant, v. ANNA C. KILBRIDE, Otherwise Known as ANNIE KILBRIDE, Respondent.

Second Department, February 9, 1917.

Executors and administrators — suit by legatee against executor to set aside bill of sale and recover interest in estate — voluntary over-payment to legatee not a debt to the estate — liability of executors for overpayment — equity — mistake.

In a suit by a legatee against one of the executors and another legatee to set aside a bill of sale and to recover his share in the estate, it was contended by the defendant that the plaintiff by the bill of sale and in consideration of money advanced to him, had transferred to her his interest in the estate. Evidence examined, and held, insufficient to establish the consent or acquiescence by the plaintiff in the transaction.

If the amount paid to the plaintiff was a voluntary over-payment, it did not constitute a debt to the estate.

The amount due the plaintiff upon his legacy will be determined by an adjudication upon an accounting, and if thereupon there appears to have been an overpayment as a voluntary advance by the executors, the liability will be theirs, although they may then have an action to recover against the plaintiff.

If the transfer by the plaintiff was made in consequence of the assumption that the overpayment on account of the legacy in itself created a debt of the plaintiff to the estate, which he was immediately liable for, then the case presented a mistake and a case for a cancellation by a court of equity.

APPEAL by the plaintiff, Michael Martin, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Orange on the 21st day of March, 1916, dismissing the complaint on the merits, upon the decision of the court after a trial at the Orange Special Term.

*Martin Conboy* [*Guernsey Price* with him on the brief], for the appellant.

*George H. Decker* [*John C. R. Taylor* with him on the brief], for the respondent.

JENKS, P. J.:

No money nor any valuable thing passed to the plaintiff as the consideration expressed in the bill of sale and in the indenture. But the defendant contends that she paid the consideration as follows: The bill of sale and the indenture trans-

ferred, in consideration of $200, the legacies of the plaintiff that consisted of a twelfth share in the business of the testator and of a twelfth share in his homestead when sold. Under the will the executors had carried on that business, which they were empowered to do until Rose Martin attained her majority. The business had earned upwards of $550 a year for each share or twelfth. The executors had paid from time to time, to the various legatees, as on account of the legacies, certain moneys earned in the business. These were voluntary advances. The executors' first intermediate account, that covered a period from 1911 to January 1, 1913, showed payments to this plaintiff, and the contention of the defendant is that he had received all profits that belonged to him up to that date. In July, 1913, the executors paid to him $200 by their executors' cheque, entered it on their books and took a receipt from plaintiff as a payment on account of his legacy. The business was continued. In February, 1914, the plaintiff executed the said instruments in favor of the defendant, who was his half sister, a legatee entitled to one-sixth of said properties, one of the two executors of the will and the manager of the said business. In July, 1914, she contends that she was entitled to receive a dividend or a payment out of the business and on account of her legacies of $585.63; that the executors charged that amount against her in their accounts, but she received their cheque for $383.63 only, because she thereby intended to restore to the estate $200, the amount of the " dividend " paid to the plaintiff on account of his legacy in July, 1913. This " payment " she contends was a payment of the consideration expressed in the bill of sale and in the indenture whereby the the plaintiff transferred to her personally all of his interest in the business and in the homestead.

Defendant offered evidence that the plaintiff consented to the payment of the said consideration in that manner. It was unnatural that he should have done so, because he was in sore need of money, as she admits; she well knew he had come to her to sell his interest, with the statement that if she would not buy it he would go elsewhere, and there is no proof that he had been pressed to return the said $200; on the contrary, the evidence of the defendant and of her attorney is that

they, or at least the attorney, in defendant's presence, had urged him not to sell, because a sale would yield little, and the business if continued might be profitable. Yet we have the version of the defendant that the plaintiff, almost without protest, transferred all of this property to her personally, understanding that he would receive nothing by the transfer. Without regard to the testimony adduced upon this feature by the plaintiff, analysis of the testimony offered by the defendant does not show plainly that the plaintiff acquiesced in such transaction. The defendant, after testifying to the interview that led up to this sale, held at her attorney's office between him, her and the plaintiff, testifies on cross-examination that the "arrangement" of "your paying it back to the estate out of your money to cover that overdraft was as you have stated it? * * * Q. Did you tell him [*i. e.*, the plaintiff] so at that time? A. He knew it." (Motion to strike out not passed upon.) To the Court: "Q. How did he know it? A. Because he came and borrowed the $200." To defendant's counsel: "Q. And with reference to paying it back by yourself, what was said? A. Why, you told me to take care of the money that he had already borrowed. Q. Out of your own money? A. Yes. Q. And you did? A. I did. Q. And paid him? A. Yes." Later on, when recalled on her own behalf, the defendant testifies: "He [the plaintiff] said he was going to sell it and he said he would sell it for the money that I had advanced to him, as you [her attorney] told me if that was the case for me to take it over rather than let a stranger in it. Q. What was said with reference to paying the estate the money that was advanced him? A. You told me to pay that back into the estate." The attorney for the defendant, after testifying that he told the plaintiff that he could not get $200 in the market nor anything out of the homestead until after two lives were out, and that the business was an uncertainty — it might be worth next week absolutely nothing, but if continued it might continue to pay a dividend — says that the plaintiff said, "All right, I will do it," and that the witness advised the defendant to take it under those circumstances. "I said to them that out in the market and with the uncertainty it wasn't worth

$200, but Miss Kilbride [the defendant] said 'He has been paid $200 out of the estate more than is due him or belongs to him.' 'Well,' I said, 'that should be paid back. Miss Kilbride, then you must, out of your own money, pay back to the estate this $200 that has been overpaid to Mike [the plaintiff], for he has had it. *That will make the estate good and give Mike his $200.'* And the papers were drawn and executed. Q. What did the plaintiff say in regard to that? Did he express himself about it? A. Certainly. He said 'That is all right,' * * * or in substance that. I don't know that he said those words." On cross-examination the witness was asked: "Q. How much did he tell you he wanted for it? A. I don't recollect that he mentioned any figures, but it was agreed on $200." When we consider that the plaintiff's quest was money, as the defendant knew, that $200 had been agreed upon, the proof that the defendant's attorney had told her that the " dividend " of six months before must be paid back by her out of her own money, coupled with the statement, *" That will make the estate good and give Mike his $200,"* leaves it doubtful, to say the least, whether the plaintiff realized that he in effect, by the transfer of all of his interest to the defendant, was to receive nothing, but was thereby to furnish her with her own money whereby to restore the " overpayment " by the advance to him of some months previous. Almost the only positive statement of the defendant is found in the sentence, " he said he would sell it for the money that I had advanced to him." Plaintiff's witness Price, an attorney, testifies that when he called upon the defendant she said that the plaintiff had not given to her what he had in the homestead, and Morrison, a friend of the plaintiff who went with him to call upon the defendant, testifies that she said that the plaintiff had not sold his interest in the homestead. The defendant testifies that she did not remember her statement to Price, she may have made it, but that she did make it to Morrison and that she made it because she had forgotten that fact, and that she had forgotten it when she had been visited by Price. Miss McCarthy, the stenographer and typewriter in the office of the defendant's attorney, while she remembers the interview and parts of the conversation, neither recalls nor remembers any of the talk

regarding the alleged overpayment of the $200. The plaintiff testifies that at the time of the execution of the instruments and before delivery, he asked the defendant if he could get his dividends just the same, and that she answered, "Certainly. This is simply a temporary assignment," and he denies that he ever heard her attorney tell her that she was to put back the $200 into the estate. The testimony of the plaintiff is that he was advised by the attorney to make the assignment and then to return to "fight your creditors." He is to a degree corroborated by the attorney, who testifies that after he had heard the plaintiff's statement he said, "If what you tell me is true, you don't owe these people. Now, what you need is legal assistance," and thereupon he referred him to some attorneys in New Jersey. I am not satisfied that the defendant established the consent of the plaintiff to this manner of paying the consideration. If she did not, then there was no consideration paid, and in any event the plaintiff would be entitled to the payment thereof.

There is some ground in the present record for the conclusion that there was mistake, at least the evidence upon a new trial may consistently develop such a condition. There is no doubt that the $200 was paid as a "dividend" on account of the legacy in accord with the surrounding facts and the policy of the executors. If it was a voluntary overpayment, it did not constitute a debt of the plaintiff to the estate. The law did not recognize the payment, but contemplated that sum as still of the assets in the hands of the executors. (*Matter of Underhill,* 117 N. Y. 471, 475; *Matter of Hodgman,* 140 id. 421, 430; *Matter of Robertson,* 51 App. Div. 117; affd., 165 N. Y. 675.) The amount due the plaintiff upon his "legacy" will be determined by an adjudication upon an accounting, and if thereupon there had been an overpayment as a voluntary advance by the executors, the liability would be theirs, although they might thereupon have an action to recover against the plaintiff. (See *Buffalo Trust Co.* v. *Leonard,* 154 N. Y. 141, 146.) If the defendant as an executor discovered that there was an overpayment, she could, of course, make it good at any time, and if the overpaid legatee consented to the application of his funds in her hands to that purpose, she could use them. If

the transfers were made in consequence of the assumption that this overpayment on account of a legacy in itself then created a debt of the legatee to the estate which he was immediately liable for, then this case might present a mistake for cognizance ·for a cancellation by the equity court.  (See Pom. Eq. Juris. [3d ed.] § 849; *Broughton* v. *Hutt,* 3 De Gex & J. 501; *Cooper* v. *Phibbs,* L. R. 2 H. L. 149, especially per Lord WESTBURY; *Skillman* v. *Teeple,* 1 N. J. Eq. 232; Adams Equity [8th ed., Ralston], 189, n. 2; *Champlin* v. *Laytin,* 1 Edw. Ch. 467; affd.,* 18 Wend. 407; *Bowron* v. *Curd,* 88 S. W. Rep. 1106.) As to the general power of the court of equity, see *St. Stephen's Church* v. *Church of Transfiguration* (201 N. Y. 10).

The eighth and eleventh findings are not supported by the proof.

The judgment is reversed and a new trial is granted, costs to abide the final award of costs.

THOMAS, RICH and PUTNAM, JJ., concurred; CARR, J., not voting.

Judgment reversed and new trial granted, costs to abide the final award of costs.